IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 1, 2009

**ERIC MAXIE v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-00820     James M. Lammey, Jr., Judge**

_____

**No. W2009-00170-CCA-R3-PC  - Filed July 2, 2010**

_____

The petitioner, Eric Maxie, appeals the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief.  A jury convicted the petitioner of aggravated sexual battery, a Class B felony.  The trial court sentenced him as a Range I violent offender to serve ten years and six months in the Tennessee Department of Correction.  On direct appeal, this court affirmed the petitioner's conviction.  The petitioner filed a petition for post-conviction relief alleging the ineffective assistance of counsel, and the post-conviction court denied his petition.  On appeal, the petitioner contends that the post-conviction court erred when it denied his petition for post-conviction relief.  After reviewing the record, the parties' briefs, and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Deena L. Knopf, Memphis, Tennessee, for the appellant, Eric Maxie.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lora Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Facts and Background**

    A grand jury indicted the petitioner, Eric Maxie, for rape of a child.  The facts as established by this court on direct appeal are as follows.

Tosca Moore testified that she allowed A.B., FN1 the victim, age eight, and her mother to live with her in her townhouse for a few weeks starting in December 2003 FN2 due to A.B.'s mother's financial problems. She testified that because of limited space, A.B. shared a bedroom and a bed with her daughter, age seven. One night when A.B.'s mother was out, Ms. Moore put the children to bed. After some time, she heard the girls whispering, and she entered the bedroom, intending to make them go to sleep. She testified that the blankets were pulled up to the girls' necks, which was unusual for her daughter. When she adjusted the blankets, she noticed that the girls had their nightgowns pulled up to their necks and were not wearing panties. She explained that her daughter always sleeps in her panties.

FN1. It is the policy of this court to refer to victims of sexual abuse by their initials.

FN2. She testified, "December 2004," but all other testimony indicates December 2003.

Ms. Moore sent her daughter to her room and instructed A.B. to go to sleep. She waited an hour before questioning her daughter. She then spoke with her sister, who also lived with her, seeking advice on when and how to talk to A.B.'s mother. Ms. Moore decided to talk to A.B.'s mother the next evening. She told A.B.'s mother to determine how the victim learned the behavior because, in her experience, "children didn't just think up those actions, that they're usually shown to . . . children."

On cross-examination, Ms. Moore explained that the girls did not share a bedroom after the incident. She further explained that she waited until the next evening to talk to A.B.'s mother, taking time to process the situation and making sure that she "took the proper steps and that [she] really understood [the situation] and wasn't blowing it out of proportion."

A.B.'s mother testified that after Ms. Moore reported the behavior, she questioned A.B., and as a result of A.B.'s answers, she contacted A.B.'s father. She then took A.B. to the Memphis Police Department East Precinct and filed a complaint against the [petitioner], who she had dated from November 2001 to April 2003, when they amicably parted ways. There she was told to take her daughter to the Memphis Sexual Assault Resource Center (MSARC) for a physical exam and to the Child Advocacy Center to give a statement. Sometime after taking A.B. to MSARC, A.B.'s mother confronted the

-2-

[petitioner]. A.B.'s mother further testified that over one year later, the authorities contacted her regarding the case. She testified that at the time of trial, A.B. was emotionally stable and a "B/C student."

On cross-examination, A.B.'s mother testified that she went to the police department around the first of December approximately two or three days after her discussion with A.B. She neither recalled with whom she spoke nor whether the interview was taped. She did not take A.B. to MSARC and Child Advocacy Center until the middle of January because A.B.'s father, who lived out of state, had already made arrangements for A.B. to visit him during the Christmas Holidays. A.B.'s mother testified that approximately one year later law enforcement officers knocked on her door looking for the [petitioner], and she was confused about why they were looking for him at her new address.

A.B. testified that she was born on January 5, 1996, and she remembered getting in trouble the night Ms. Moore separated her from Ms. Moore's daughter. When her mother talked to her about this incident, A.B. told her that she learned the behavior from the [petitioner]. She testified that the [petitioner] lived with her mother in Memphis at an apartment.

A.B. testified that one morning when her mother was at work, A.B. entered her mother's bedroom to watch television. She testified that the [petitioner] was in the bedroom wearing a t-shirt and underwear. He instructed A.B. to disrobe, and she refused. After he said that he would do it for her, she complied, removing her "footy pajama[s]." She testified that the [petitioner] then went to the bathroom, removed his underwear, and that he then "put his private in mine" while they were lying on the bed. She testified that the [petitioner] also touched her buttocks with his hands and mouth, her mouth with his lips and tongue, and her vaginal area with his hands, mouth, and penis.

A.B. stated that she refers to male genitalia as "nuts" or "private" and that she also knows what a penis is. She described the [petitioner]'s penis as being round, at least two and one-half inches long, and round on the top. A.B. testified that she was referring to the [petitioner]'s penis when she said "his private." She stated that her "private" was her vagina and that the [petitioner] put his private not on the outside of the vagina where the skin is but "inside." A.B. testified that she asked the [petitioner] to stop and cried. She further explained, "It felt like somebody was just taking a knife and stabbing me with

-3-

it for no reason." A.B. testified that she did not tell her mother because the [petitioner] said "that he would take a knife or a gun and kill [her and her mother]." She also testified that this happened more than once, but she did not remember how many times.

On cross-examination, A.B. testified that the abuse occurred during the time period when the [petitioner] lived with her mother. She testified that, during this time period, she visited her father out of state, attended school, and went to church. A.B. did not tell anyone of the abuse until Ms. Moore caught her and her friend in bed. A.B. testified that she went to the police and to the doctor after she told her mother.

Memphis Police Department Sergeant Bridgett White, a member of the sex crimes and child abuse unit, testified that she was assigned to the [petitioner]'s case in December 2003, along with the Department of Children's Services (DCS). She testified that DCS obtains the victim's statement, and she is responsible for obtaining the [petitioner]'s statement if possible. Sergeant White testified that the DCS investigator scheduled A.B.'s forensic interview. After the interview, the results were relayed to her, and she attempted to contact the [petitioner] via two different certified letters. Once the letters were returned to her with no reply, Sergeant White contacted the Attorney General's office, seeking an indictment.

Rochelle Copeland, a forensic nurse practitioner and coordinator of MSARC, testified that A.B. was physically examined at MSARC by Anita Boykins, another forensic nurse practitioner, who no longer worked at MSARC. She testified that standard procedure requires a report on each patient, and Ms. Boykins prepared such a report for A.B. Ms. Copeland explained that the results of the physical exam showed a chronic injury to A.B.'s hymen. She explained that "[c]hronic means an injury that [has] healed. It [is not] an injury [that occurred] over and over." She further testified that this injury was classified as a "2-B," meaning a nonspecific injury. Ms. Copeland explained that an injury is classified as "nonspecific" either because of the injury's location or some other medical condition, such as infection.

On cross-examination, Ms. Copeland testified that at the time of the exam, A.B. was eight years old. She explained that a classification of "3-A" or "3-B" would indicate actual penetration of the vaginal vault, not necessarily the labia or the hymenal area. She testified that no follow-up treatment was recommended.

-4-

On redirect examination, she testified that when classifying an injury, penetration is considered penetration of the vaginal vault. A.B.'s classification of "2-B" does not necessarily mean that it is inconsistent with penetration of the labia.

After Ms. Copeland's testimony, the State rested its case, and the [petitioner] presented no proof. The State elected to prove the indicted offense of rape of a child by actual penetration by the [petitioner] of A.B.'s vagina. *See* T.C.A. § 39-13-503(a) (2006) (establishing penetration as an element of rape); *see also id*. § 39-13-522 (increasing felony classification of rape offense when the victim is less than 13 years of age).

*State v. Eric Maxie*, No. W2006-00604-CCA-R3-CD, 2007 WL 907530, at *1-3 (Tenn. Crim. App. at Jackson, Mar. 26, 2007). The jury convicted the petitioner of aggravated sexual battery. The trial court sentenced him, as a standard violent offender, to serve ten years and six months in the Tennessee Department of Correction. On direct appeal, this court affirmed the petitioner's convictions. *See id.* at *1.

On December 17, 2007, the petitioner filed a pro se petition for post-conviction relief alleging the ineffective assistance of trial counsel. The court appointed counsel who then filed an amended petition for post-conviction relief alleging that both trial and appellate counsel[1] were ineffective. The court held a hearing on the petition for post-conviction relief on November 10, 2008, and the parties presented evidence as summarized below.

Tosca Moore testified that she remembered testifying at the petitioner's trial in 2006. She testified concerning A.B.'s allegations of rape. Ms. Moore was "pretty close friends" with A.B.'s mother from 2003 through 2007, and they "really started becoming close" in 2004. Because of their friendship, Ms. Moore had several interactions with A.B. and saw her "[a]t least two or three times a week." In December 2005, A.B. and her mother lived with Ms. Moore for a month.

Ms. Moore testified that "overall" A.B. was a truthful person and "certainly had the capability to be truthful." She recalled A.B.'s mother expressing problems with A.B.'s

---

[1] In his amended petition for post-conviction relief, the petitioner alleges ineffective assistance of both trial and appellate counsel. However, at the hearing on the petition for post-conviction relief, the petitioner did not present any evidence regarding appellate counsel's ineffectiveness, and the petitioner's appellate brief only alleges the ineffectiveness of trial counsel. Accordingly, we will deem the issue of the ineffectiveness of appellate counsel abandoned and, thus, waived on appeal. *See* Tenn. R. App. P. 13(b).

-5-

honesty related to issues at school. When asked her opinion of whether A.B. was truthful, Ms. Moore stated, "I don't feel she's completely honest. You know, I feel like she's a child; and as a whole, she can be honest; but my gut feeling is that, you know, she's had issues with it." She further stated that during the time A.B. lived with her, "there was definitely some sneakiness" on the part of A.B. Ms. Moore did not recall answering any questions regarding A.B.'s honesty during the petitioner's trial.

On cross-examination, Ms. Moore stated that she was a witness for the prosecution during the petitioner's trial. When asked whether as a state witness she thought it was important to testify that A.B. was untruthful, Ms. Moore said that she "followed the lead of the attorney that questioned [her]," and her "position was that [her] daughter was violated." She understood that the petitioner's trial was about A.B.'s rape and not her daughter. Ms. Moore testified that she did not feel that A.B. had lied about the incident. Ms. Moore stated that A.B. "expressed whatever she knew or experienced . . . [and] acted that out on [her] child." She further stated that she "[a]bsolutely" felt that A.B. had learned her actions from somewhere "[b]ecause, at the age that it happened, they were entirely too young to have thought that up." After Ms. Moore expressed her feelings to A.B.'s mother, she did not pursue the issue any further.

The petitioner testified that a grand jury indicted him on one count of rape of a child, and the jury convicted him of aggravated sexual battery, a lesser included offense. At the time of the post-conviction hearing, he was serving his ten and a half-year sentence. He stated that he understood post-conviction relief and what his remedy would be if the court granted his petition. He discussed his pro se and amended petitions for post-conviction relief, which alleged ineffective assistance of counsel, with his post-conviction counsel.

The petitioner recalled that the court appointed trial counsel on July 29, 2005. The petitioner stated that trial counsel visited him in jail once between when the court appointed him and his trial. During his court appearances, trial counsel would speak to the petitioner for a minute, and the court would reset the petitioner's case. However, the petitioner said that he never had a chance to fully discuss his case with trial counsel. The petitioner estimated that he spoke with trial counsel three times in the courtroom. The petitioner said that he wrote to trial counsel to disclose potential witnesses and "things that [he] needed." According to the petitioner, trial counsel did not contact his family and failed to return a call to his parents.

Trial counsel gave the petitioner a copy of the state's discovery, but the petitioner said that the discovery packet did not include a diagram of A.B. or the names of two state witnesses. The petitioner recalled that Rochel Copeland testified as his trial, but the discovery packet did not mention that she would be testifying against the petitioner. The

petitioner said he did not know who she was until his trial. Trial counsel also gave the petitioner a copy of the indictment and discussed with him the indictment and the punishment range for the indicted offense. The petitioner said that trial counsel did not tell him that the jury could convict him of a lesser included offense. Trial counsel discussed a settlement offer from the state with the petitioner. The petitioner stated that "[t]he offer went from fifteen years to six years. Then it went from six years to two years. Then it went from two years to eleven months and twenty-nine days." He further stated that trial counsel did not "come out and fully explain" the eleven months and twenty-nine days offer, but instead "just hollered out, 'Eleven' - '[The petitioner] will take eleven/twenty-nine, Class E felony [!]'" The petitioner testified that he "was stuck on the Class E felony" classification and declined the state's offer because he was innocent. The petitioner wrote trial counsel explaining that he "was not fully aware of the charge," but trial counsel did not reply until his next court date. The petitioner advised trial counsel that he wanted to enter an *Alford*[2] plea, and trial counsel advised him that "the court withdrew their offer." When asked if he, at some point, wanted to accept the state's offer, the petitioner responded "yes and no . . . because . . . [he] was not going to sign to anything that [he] didn't do."

The petitioner said that he and trial counsel had "a communication problem," and they never discussed potential defense witnesses. The petitioner wrote trial counsel regarding potential witnesses and said that in his responses, trial counsel told him that they would speak at the petitioner's court appearances. He also said that trial counsel advised him that he never received his letter. The petitioner wanted trial counsel to call Christina Fanny, A.B.'s teacher, Sharon Etticus, and his parents as witnesses. The petitioner stated that Ms. Fanny, a friend of A.B.'s mother, could have testified regarding A.B.'s "sexual behavior" because she had watched A.B. and had a problem with A.B. being around her children. He further stated that A.B.'s teacher would have testified to A.B.'s "credibility [for] truthfulness because [there were] a lot of problems that [they] were having over at the school with [A.B.] telling the truth." The petitioner recalled that A.B. would lie about her homework. He also recalled that during a meeting with A.B.'s principal about her behavior, A.B.'s mother "blew up and said that's not her child - her child doesn't lie." The petitioner said that his parents would have testified that during a visit, A.B. stole money from the petitioner's mother's purse. He also said that A.B.'s mother spoke to his mother about "some things," but he did not specifically know what she said. According to the petitioner, the only person that trial

---

[2] *See North Carolina v. Alford*, 400 U.S. 25 (1970) ( holding that "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime," or even if his guilty plea contains "a protestation of innocence when . . . a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt.")

counsel spoke with on his behalf was his brother. However, the petitioner stated that trial counsel told him that he spoke with A.B. and her mother.

In his letter, the petitioner informed trial counsel that he did not think that A.B. was truthful and that she had "some sexual behavior and stuff[.]" He asked trial counsel, in a letter, to subpoena A.B.'s school record, but trial counsel said that he did not receive the letter. The petitioner stated that trial counsel did not file any pretrial motions or "particulars." The petitioner received a copy of his indictment and said that it alleged the incidents occurred from December 2001 until March 2003. The petitioner said that the incident could not have possibly taken place during this time because he was incarcerated from December 2001 through February 2002. He also said that during the period alleged in the indictment, he "never really actually stayed" with A.B. and her mother. According to the petitioner, he lived with his grandmother and would go to A.B.'s mother's house "and maybe stay a couple of days or so." The petitioner said that he lived with A.B. and her mother for two weeks in January 2002, and he lived with A.B.'s mother while A.B. was in Kansas visiting her father from May 2002 to July 2002. While A.B. was away in Kansas, A.B.'s grandmother called A.B.'s mother and told her that a pastor caught A.B. kissing a little boy in the bathroom. The petitioner said that he did not tell trial counsel about the phone call because of "communication problems." The petitioner testified that he was incarcerated from December 2001 through March 2002[3], and he was living in Kentucky from September 2002 through January 2003. The petitioner recalled that he was once home alone with A.B. because she had a snow day off from school. He worked nights and stayed with her while her mother worked a half day. Also, the petitioner occasionally was alone with A.B. when he took her to school after spending the night with her mother.

The petitioner admitted that he had previous forgery and DUI convictions. He said that he and trial counsel discussed whether he would testify. He further said that counsel misled him by telling him that "there was [sic] other past convictions on [him] that would have came out that would have probably led a jury to convict [him]. . . ." According to the petitioner, this made him skeptical about testifying, and he was "really mentally confused [about] the whole thing." He stated that had he testified at his trial, he would have said that he was innocent and testified about "a lot of things that should [have] come out that didn't come out." He also stated that he would have testified about inconsistencies in A.B.'s statements, which trial counsel did not cross-examine A.B. or her mother about.

The petitioner said that trial counsel did not inform him that he could have someone present to support him at his sentencing hearing. The petitioner's parents lived in

---

[3] Initially, the petitioner testified that he was incarcerated from December 2001 through February 2002, but he later testified that the period was from December 2001 until March 2002.

Minneapolis, Minnesota, and the petitioner said that because the court continually reset his cases, if his parents had come for his trial "it just would have been a wasted trip for them." The petitioner felt that trial counsel "should have had more time to really investigate the case.

On cross-examination, the petitioner testified that when he came for his court hearings, trial counsel did not talk to him while he was in "lockup". He said that trial counsel only gave him the discovery packet and told him when his next court date would be. He stated that after his September 2 or 3 court date, trial counsel told him that the state offered him fifteen years, but the petitioner declined the offer. The petitioner admitted that trial counsel discussed the case with him more than once.

The petitioner did not know why the potential trial witnesses he testified about were not present for the post-conviction hearing. He asked all the witnesses to be present except Ms. Rose because he forgot to mention her to post-conviction counsel. He stated that the witnesses would testify to A.B.'s character for truthfulness. The petitioner admitted that he also had convictions for theft of property, failure to appear, and violation of probation, which went to this character for truthfulness.

The petitioner clarified that the diagram that was missing from his discovery packet was the report from the Memphis Sexual Assault Resource Center (MSARC). The petitioner did not know that Ms. Copeland worked for the MSARC. He said Ms. Copeland testified about the MSARC report, which he had seen before trial. The petitioner was aware that the report did not prove penetration of the victim and agreed that the report helped his case. When asked how not having the report hurt him, the petitioner answered, "It really didn't hurt me."

The petitioner stated that he understood his right to testify, but he did not testify because he and trial counsel had "communication problems," and he "really didn't know what to say." The petitioner was unaware that trial counsel filed a motion for a *Morgan*[4] hearing to prevent the state from admitting the petitioner's prior convictions, and he neither attended the hearing on the motion nor read the transcript of the hearing. The petitioner recalled telling the court, during a *Momon*[5] hearing, that it was his decision not to testify. He

---

[4] *See State v. Morgan*, 541 S.W.2d 385, (Tenn. 1976) (holding that "where a witness is sought to be cross-examined as to specific instances of conduct as contemplated by Rule 608(b), the Court shall conduct a jury-out hearing for the purpose of determining that the probative value of such evidence outweighs its prejudicial effect").

[5] *See Momon v. State*, 18 S.W.3d 152, 162 (Tenn. 1999) ("To ensure that defense attorneys in . . . criminal cases do not unilaterally deprive criminal defendants of the fundamental right to testify, in every
(continued...)

also recalled that the court advised him that his prior convictions would be admissible. According to the petitioner, it was his "decision not to go and testify. But, at the same time, [trial counsel] misled [him] on the situation of testifying." He said counsel misled him by advising him that the court would admit his prior convictions; however, he agreed that trial counsel told him the truth. When asked how counsel was at fault for telling him the truth, the petitioner responded, "Okay. Well, that . . . was on me, then."

The petitioner complained that trial counsel did not subpoena A.B.'s school records. Post-conviction counsel subpoenaed the records, but the petitioner did not look through them. The court asked post-conviction counsel if the files contained any exculpatory information, and post-conviction counsel stated that the records mentioned that A.B. "craves attention or something of that nature." The petitioner was aware that trial counsel filed motions for a new trial and discovery, and he also filed a notice of appeal.

The petitioner stated that the potential witnesses he mentioned were not at his sentencing hearing, and he did not tell anyone about them. He stated that his "parents stay[ed] out of town, and everybody else that [he] needed to speak with [had] locks on their phone." He said he wanted trial counsel to contact his parents. The petitioner's parents visited him in jail once in 2007, and he told them about his court date. The petitioner also said that his parents knew about his case, but they were not present because his sister was sick, and "there [were] a lot of things going on in [his] family that [his] parents could not get [there]." On redirect examination, the petitioner stated that his sister had been hospitalized for a year and required "twenty-four-hour nursing, and [his parents were] not able to leave her side . . . ."

Trial counsel testified that the trial court appointed him to represent the petitioner on July 26, 2005. The entire time trial counsel represented him, the petitioner was incarcerated. He believed that the state gave him discovery for this case the same day the court appointed him, and he gave the petitioner a copy of the discovery packet. Trial counsel gave the petitioner all the discovery that he had and said the copy of A.B.'s diagram "did not come through real good."

Trial counsel recalled that the state first offered the petitioner "fifteen as charged" in exchange for his guilty plea. The state then offered "criminal-attempt aggravated sexual battery, six years at thirty percent but with no petition to suspend." The petitioner rejected

5(...continued)
trial where the defendant does not testify, the trial court should . . . require,"defense counsel, at any time before conclusion of the proof, to request a jury-out hearing, "to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify").

this offer. The state next offered a two-year sentence to the charge of sexual battery, but the petitioner rejected the offer. Finally, the state offered "eleven/twenty-nine" on a guilty plea to simple assault, but the petitioner again rejected the offer.

Trial counsel said that the trial court did not reject an *Alford* plea because the petitioner never sought one. He had never seen the trial judge reject an *Alford* plea. He believed that the petitioner was referring to when he told trial counsel "Okay, I will take the eleven/twenty-nine on an *Alford* plea[.]" Trial counsel explained that "[A.B.]'s mother . . . had gotten so sick of it, she had put her two cents worth in and said, 'Okay. No. No. No deals. Let's just go ahead and throw the spaghetti against the wall and see what sticks,' in effect." He said that because A.B.'s mother had grown "tired of the back and forth," the prosecutor withdrew the offer. When trial counsel originally presented the offer, the petitioner rejected it saying that he would not "take any time for anything he didn't do." Trial counsel advised the petitioner that "the whole purpose of the *Alford* plea was [that] this simple assault was not going to hurt him in the whole scheme of things on his record." He also explained to the petitioner that simple assault was not sexual, and "it's just like if you walked up and slapped somebody on the face." Later, in a letter to trial counsel, the petitioner stated that he "'probably should have taken that eleven/twenty-nine *Alford*.'" When he received the letter, trial counsel called the prosecutor to accept the deal, but the prosecutor advised him that she withdrew her offer. Trial counsel testified that he was "flabbergasted - and doubly flabbergasted when [the petitioner] said he wasn't going to sign for anything he didn't do. [A] simple assault was not going to be . . . a sexual offense on his record."

Trial counsel said that he thought he visited the petitioner in jail more than once; however, the system that tracks inmate visits only reflected one visit. He recalled "nine or ten report dates" when he would have seen the petitioner. According to trial counsel, the only time the court would have reset the case without the petitioner being present would be if the court held the hearing to the next day. Trial counsel stated that he and the petitioner discussed the case "innumerable times" while the petitioner was in lockup.

Trial counsel recalled that the petitioner asked him to look at A.B.'s school records. He advised the petitioner that if A.B.'s file had a prior allegation of sexual abuse, the school would have reported it to the Department of Children's Services, and the prosecutor would have known about it and used it in the state's case-in-chief. He further stated that the prosecution would have notified him about the prior allegation as exculpatory evidence. Trial counsel "wish[ed] [he] had gone and subpoenaed [the records] . . . so [he] could show [the petitioner] there was nothing in there."

Trial counsel did not recall anything about potential witness Christina Fanny[6] or A.B.'s prior sexual behavior. He stated that he did not know what sexual behavior a six-year-old would have had. Trial counsel spoke with the petitioner's brother "two or three times" and thought that he had spoken with his father, but he did not speak with the petitioner's mother. Trial counsel thought the petitioner's parents were in Chicago, Illinois.

Trial counsel did not recall the petitioner telling him that he had learned of sexual behavior by A.B. while she was visiting her aunt out of state. Trial counsel spoke with A.B.'s mother and asked her "if there was anything that [he] needed to know, whether it be any prior inappropriate behavior by her daughter that she had ever been . . . apprised of . . . ." A.B.'s mother responded no. He also explained to A.B. the gravity of her accusations against the petitioner. The day of the post-conviction hearing, trial counsel asked A.B.'s mother if it were possible that A.B. recanted her story, and A.B.'s mother responded, "'Absolutely not.'" He also asked A.B.'s mother about A.B. telling the people at the sexual assault center that her mother did not see her and the petitioner in a compromising position and only heard the petitioner tell her to "'pull [her] clothes up.'" He said A.B.'s mother responded, "'No, we would not have been here for [the petitioner] raping my daughter or touching her inappropriately; we would have been here for a murder charge because I would have killed him.'" Trial counsel stated that he did not ask A.B. about her statement to the Child Advocacy Center that her mother previously had caught her and the petitioner in a compromising position because she later recanted her statement. Trial counsel also believed that if he cross-examined her regarding the statement it "might open the door to the full contents of sixteen and a half pages of allegations that [the petitioner] had done this ten times in the past." Trial counsel said he made a strategic decision not to ask A.B.'s mother about whether she heard the petitioner tell A.B. to pull up her clothes. He did not ask her because he took A.B. stating that her mother heard this to be a recantation of the allegation that A.B.'s mother saw them in a compromising position. He stated that the statement "could have been in reference to . . . it's time to go to school or something of that nature." He further stated that

> the fact that she recanted it . . . took away much of the steam[,] if not all[,] of the allegation she had made earlier. Plus, the allegation she had made earlier just did not ring true because . . . her mother did not seem [like] the type that would have taken to seeing something like that happen to her daughter.

---

[6] While testifying, the petitioner identified the witness as Christina Fanny. Trial counsel testified that her name was Christina Fanning. Throughout this opinion, will refer to her as Christina Fanny for consistency.

Trial counsel did not believe A.B.'s statement or allegation that the petitioner had done this ten times in the past. He tried to cross-examine A.B. "as effectively as [one could] cross-examine an eight-year-old in front of a jury without just coming out and . . . calling her a liar."

Trial counsel asked Ms. Moore's permission to speak with her daughter about the incident between her and A.B.; however, Ms. Moore declined, and trial counsel never spoke with her daughter. He discussed with Ms. Moore what she saw happen between her daughter and A.B., but he did not ask her whether she knew A.B. to be truthful. Trial counsel recalled that the state's position was that because A.B. was only six years old at the time of the incident with Ms. Moore's daughter, she had to have learned that behavior somewhere. Trial counsel agreed that in her statement, A.B. said that it was Ms. Moore's daughter's idea to "'play house.'" He did not ask A.B. about the incident being the other girl's idea at trial and disagreed that it would refute the state's position that A.B. had learned that behavior elsewhere.

Trial counsel testified that the indictment charged that the petitioner had raped A.B. between December 1, 2001 and March 31, 2003. He did not file a motion for bill of particulars to narrow the time because A.B. could not pinpoint when the rapes occurred. Trial counsel could not remember whether the state listed Ms. Moore and Ms. Copeland in the discovery packet as people with knowledge of this case. He did recall the prosecutor telling him that she was going to call Ms. Moore and Ms. Copeland. Trial counsel told the petitioner that he anticipated Ms. Moore testifying and that he had talked to her. Trial counsel did not ask Ms. Moore about whether she had an opinion about A.B.'s truthfulness

> because what she testified to is what she saw with her own eyes; and her own eyes saw her daughter and [A.B.] in a compromising position with her nightgown pulled up with [A.B.]'s panties pulled down; and whether or not she believed anything [A.B.] had ever said would not take away from the fact that she'd caught them playing doctor or playing house.

Trial counsel did not know how Ms. Moore's opinion about A.B.'s character for truthfulness would relate to her catching A.B. and her daughter under the covers.

Trial counsel did not ask A.B., on cross-examination, about any bias or prejudice she may have had toward the petitioner. A.B. stated that the petitioner had lied and had also stolen money from her mother, and, consequently, her mother could not get her everything that she wanted. Trial counsel said that he did not question A.B. about these statements or her apparent resentment because the petitioner took away from her mother's ability to get her

-13-

what she wanted. He did not question her in this regard because he did not want to bring out things that would hurt the petitioner more than they would help him.

Trial counsel filed and argued a "609 motion" to prevent the court from allowing the state to use his prior convictions to impeach him. Trial counsel said that he filed and argued the motion early so the petitioner would know which convictions the court admitted. He also said that he encouraged the petitioner to testify and told him that if he did testify, they would address the convictions on the front end of his direct examination. Trial counsel stated he always instructed his clients to testify at trial in their own defense "unless they're just complete idiots, and [the petitioner was] not that . . . ." He "strongly urged" the petitioner to testify in his own defense at trial because "from [his] reading of the MSARC report . . . there was not going to be any allegation of any kind of penetration except for the young girl's testimony. And that he would leave a touching unchallenged." The report showed possible evidence of touching, but not penetration. Trial counsel said that his goal was always to get a verdict of not guilty, but if he cannot, his goal is to get a verdict of guilty on a lesser included offense. He told the petitioner that he "thought [he] had the lesser included offense pretty much in hand;" however, the petitioner was "hung up" on the court admitting his prior convictions and declined to testify. The jury found the petitioner guilty of aggravated sexual battery, which did not require proof of penetration of the victim.

During the petitioner's trial, the court addressed whether the MSARC report would violate the confrontation clause. The trial judge admitted the report under the business records exception and noted that he would have to decide whether the report was testimonial. The nurse who examined A.B., Ms. Boykins, was unavailable to testify at the petitioner's trial. Trial counsel stated that her availability was irrelevant because the court allowed her report in under the business records exception to the hearsay rule. After a hearing outside the presence of the jury, the trial judge ruled that the report was non-testimonial and MSARC made it for medical reasons. Trial counsel did not raise the issue of the report violating the petitioner's right to confrontation in the motion for a new trial because he agreed with the trial judge's decision that the report was non-testimonial, and the report was not prejudicial to the petitioner. He said the report helped the petitioner "because it refuted any allegation of penetration as alleged in the indictment," and all the petitioner had to do was testify and deny touching A.B. He testified that even if the state had not used the report in their case, he "might have" used it to "knock[] out" some elements of the indicted offense.

Trial counsel did not recall contacting anyone in the petitioner's family to come and support him at the sentencing hearing. He recalled that when sentencing the petitioner, the trial judge found the petitioner's prior criminal history, unwillingness to comply with the conditions of a previous sentence, and abuse of a position of private trust to be enhancement factors. Trial counsel was familiar with the *Blakely v. Washington* case and stated that the

court's finding that the petitioner abused a position of private trust "may have [had] a *Blakely* problem . . . ." The indictment occurred before July 2005, and the petitioner could have elected for the court to sentence him under pre-*Blakely* sentencing law. On cross-examination, trial counsel testified that he filed, as a mitigating factor, that the petitioner did not cause bodily injury, and the court gave it some weight but opined that the petitioner had caused psychological injury.

Upon questioning from the court, trial counsel stated that although A.B. alleged, in the MSARC report, that the petitioner raped her ten times, she only testified to one occurrence at trial. He further stated that Ms. Moore catching the girls in a compromising position was what started "the whole thing[.]" A.B. told her mother that she learned the behavior from the petitioner molesting her, and they reported the molestation to the police.

After hearing the evidence, the post-conviction court found that the petitioner did not carry his burden of proving that counsel's actions fell below an objective standard of reasonableness and denied the petitioner's request for relief. The petitioner appeals the denial of post-conviction relief.

**Analysis**

On appeal, the petitioner argues that trial counsel was ineffective because he failed to: (1) challenge the MSARC report in the motion for new trial; (2) challenge the petitioner's sentence; and (3) impeach A.B. by questioning witnesses regarding her character for truthfulness. The state contends that the petitioner failed to prove his claims by clear and convincing evidence and is not entitled to relief. Upon review of the record, we agree with the state and conclude that the petitioner failed to show that he was denied the effective assistance of counsel.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is *de novo* with a presumption that the findings are correct. *See id*. Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed and based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Strickland*, 466 U.S. at 697*; see also Goad*, 938 S.W.2d at 370 (Tenn. 1996). If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Strickland*, 466 U.S. at 697.

*A. MSARC Report*

First, the petitioner alleges that trial counsel rendered ineffective assistance when he failed to challenge the trial court's ruling that admitted the MSARC records. The petitioner asserts that the records were testimonial and violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. Trial counsel testified that he did not challenge the trial court's admittance of the report because he believed it rebutted the victim's claims of penetration as alleged in the indictment and was beneficial to the petitioner's case. Trial counsel did not raise the issue of the report violating the petitioner's right to confrontation in the motion for a new trial because he agreed with the trial judge's decision that the report was non-testimonial and made for medical reasons. The petitioner testified at the post-conviction hearing that the report did not hurt his case. The post-conviction court found that the trial court allowed these records to come in under the business record exception, and the availability of the witness was irrelevant. The court further found that trial counsel believed that the MSARC report benefitted the petitioner and, thus, was not deficient for failing to dispute it. Finally, the post-conviction court found that the issue of the court's admittance of the MSARC record through Ms. Copeland's testimony was without merit because the admittance was proper, and, therefore, counsel was not

deficient for failing to preserve the issue for appeal. We agree with the post-conviction court's findings and conclude that the petitioner failed to prove that counsel's failure to include the admission of the evidence as an issue in the motion for a new trial fell below an "objective standard of reasonableness under prevailing professional standards." *See Strickland*, 466 U.S. at 688. Additionally, the petitioner has failed to show that counsel's failure to preserve the issue for appeal prejudiced him. *Id.* at 694. Accordingly, we conclude that the petitioner is without relief as to this issue.

### B. Enhancement Factors

Next, the petitioner argues that trial counsel was deficient for failing to challenge the trial court finding as a sentence enhancement factor that the petitioner abused a position of private trust. According to the petitioner, the trial court's application of this enhancement factor without a jury determination rendered his sentence unconstitutional and violated his right to a trial by jury. The petitioner contends that because the trial court applied three enhancement factors to increase his sentence from eight years to ten and one half years when only one factor was appropriate, counsel's deficiency prejudiced him.

In *Blakely v. Washington*, the United States Supreme Court held that a trial judge may impose a sentence that exceeds the presumptive sentence based only on the fact of a defendant's prior conviction(s) or other enhancement factors found by the jury or admitted by the defendant. *Blakely*, 542 U.S. 296, 301-04 (2004). After *Blakely*, the United States Supreme Court released its decision in *Cunningham v. California*, holding that California's sentencing scheme did not survive Sixth Amendment scrutiny under *Blakely*. *Cunningham*, 549 U.S. 270, 293 (2007). In short, the *Blakey-Cunningham* regime instructs that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely*, 542 U.S. at 301(quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Effective June 7, 2005, the Tennessee General Assembly, in response to *Blakely*, amended Tennessee Code Annotated sections 40-35-102, -210 and -401 to reflect the advisory nature of enhancement factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 1, 6, 8. The General Assembly also provided that a defendant sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, may elect for the court to sentence him or her under the amended provisions of the Act by executing a waiver of ex post facto protections. *Id*. In the instant case, the petitioner committed the offense before the effective date of the amended provisions of the Sentencing Act and chose for the court to sentence him under the sentencing statutes in effect at the time he committed the offense. Thus, the 2005 amendments to the Sentencing Act do not apply to the petitioner.

At the sentencing hearing, the trial court imposed a sentence of ten and one half years based upon its finding of three enhancement factors: (1) that the petitioner had a history of criminal convictions or behavior; (2) the petitioner had a history of unwillingness to comply with the conditions of a sentence involving release into the community; and (3) the petitioner abused a position of private trust applied in this case. *See* Tenn. Code. Ann. § 40-35-114 (2), (9), (16) (2004). Trial counsel was familiar with *Blakely* and stated that the court's finding that the petitioner abused a position of private trust "may have [had] a *Blakely* problem . . . ." The post-conviction court found that counsel was not deficient when he failed to object to the trial court enhancing the petitioner's sentence based on its finding that he abused a position of private trust. The court noted that, even if trial counsel was ineffective for failing to object to the trial court finding that the petitioner abused a position of private trust, the court also finding that the petitioner had a history of criminal convictions and a history of unwillingness to comply with the conditions of a sentence involving release into the community supported the sentence imposed by the trial court. The evidence does not preponderate against the post-conviction court's finding that trial counsel was not deficient for failing to object to the court finding that the petitioner had a history of prior criminal convictions. However, the record does preponderate against the post-conviction court's finding that trial counsel was not deficient when he failed to object to the other two enhancement factors.

The trial judge's finding as enhancement factors that the petitioner had a history of unwillingness to comply with the conditions of a sentence involving supervised release and that he abused a position of private trust violated *Blakely*. *Blakely* clearly precludes the trial court's application of these enhancement factors because the jury verdict did not reflect these factors, nor did the defendant admit them. Because this was a clear violation of *Blakely*, trial counsel should have objected to the trial court using these factors to enhance the petitioner's sentence. Accordingly, we conclude that the petitioner has shown that trial counsel was deficient for not objecting to the trial court's application of these two enhancement factors.

Because the petitioner has shown that counsel was deficient for failing to object to the trial court's finding that the petitioner had a previous unwillingness to comply with the conditions of a sentence involving supervised release and that he abused a position of private trust, we now address whether counsel's deficiency prejudiced the petitioner. The petitioner argues that he suffered prejudice because the trial court used all three enhancement factors to increase his sentence, and it did not base the petitioner's sentence solely on his prior convictions. We disagree.

Before the 2005 Sentencing Act, if there are enhancement and mitigating factors present for a Class B felony, "the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, then

-18-

reduce the sentence within the range as appropriate for the mitigating factors." Tenn. Code. Ann. §40-35-210. If the record supports its findings, the weight given to each statutory sentencing factor is left to discretion of trial court. *See Id.* § 40-35-114; *State v. Carter*, 986 S.W.2d 596, 598 (Tenn. Crim. App. 1998).

When sentencing the petitioner, the trial court applied enhancement factor two, the petitioner's history of criminal convictions or behavior, in addition to the other two enhancement factors. The court relied on the petitioner's 1998 theft conviction, a conviction for failure to appear on a misdemeanor citation for driving on a revoked license, and two convictions for driving with a revoked license. The trial court stated that these convictions "basically show[ed] that the [petitioner] doesn't care about the law . . . . So he has no prior felony convictions, but has misdemeanor convictions. I'm going to give some weight to that." The court did not comment about how much weight it would afford the other two factors. The trial court found as a mitigating factor that the petitioner's conduct neither caused nor threatened serious bodily injury to the victim; however, the court stated that it was "not going to give this mitigator much weight."

The range of punishment for Range I defendants convicted of aggravated sexual battery, a Class B Felony, is eight to twelve years, and the court sentenced the defendant to ten and one half years. *See* Tenn. Code. Ann. § 40-35-112. Under *Blakely*, a trial court may find that a defendant had a history of prior convictions without a jury determination or admission by the petitioner. *Blakely*, 542 U.S. at 301. Thus, even if the trial court's application of the other two enhancement factors was improper, the court properly used the petitioner's prior convictions as an enhancement factor. The petitioner has not shown that the trial judge relied on the improper enhancement factors with more weight or with a sufficient amount of weight that they affected or increased the sentence. Because the court's finding that the petitioner had a history of criminal convictions was sufficient to enhance the petitioner's sentence independent of the other two factors, we conclude that the petitioner has not shown that he suffered any prejudice because of counsel's deficiency, and, therefore, the petitioner is without relief on this issue.

### C. Victim Impeachment

Finally, the petitioner argues that trial counsel was ineffective for failing to impeach A.B. by cross-examining Ms. Moore regarding her opinion of A.B.'s character for truthfulness or untruthfulness. He asserts that this failure prejudiced the outcome of his case because A.B.'s lack of credibility would have "greatly influence[d] the outcome of the case as the direct and physical evidence against [p]etitioner was not overwhelming."

Ms. Moore testified that she did not recall trial counsel questioning her about whether she believed A.B. to be truthful. Trial counsel did not ask Ms. Moore whether she knew

A.B. to be truthful because she testified about what she saw with her own eyes, her daughter and A.B. in a compromising position. He stated that he did not know how Ms. Moore's opinion about A.B.'s character for truthfulness would relate to her catching A.B. and her daughter under the covers. The post-conviction court found that counsel made a strategic decision not to impeach A.B. through Ms. Moore's opinion of her truthfulness and refused to second-guess trial counsel's decision. The evidence does not preponderate against this finding. The decision to not cross-examine a witness regarding an issue is a strategical choice if it is informed and based upon adequate preparation. *See Hellard*, 629 S.W.2d at 9. It is not sound policy for this court to second-guess counsel's decisions regarding trial strategies and tactics. *Id.* "Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Accordingly, we conclude that the petitioner failed to show deficient performance of counsel as announced in *Strickland* and is not entitled to relief.

### Conclusion

Based on the foregoing, we affirm the decision of the post-conviction court.

_____
J.C. McLIN, JUDGE